UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
TYLER PIZARRO

                              Plaintiff,

   -against-                                                 Civil Action No.
                                                               1:14-cv-00507 (LDH-PK)

                                                               Amended Complaint

New York City Police Officer Detective Joseph
Bey; New York City Police Officer Detective Steven Lundy

                              Defendants
----------------------------------------------------------------X

        Plaintiff Tyler Pizarro, by and through his attorney, Kevin P. O'Donnell, states as follows:

### JURISDICTION AND VENUE

        1.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, over claims arising under 42 U.S.C § 1983.

        2.     Venue is proper in the Eastern District of New York under 28 U.S.C § 1391 (b), because that is the judicial district in which the claims arose, and in which the defendants resided or conducted business at all times relevant herein.

        3.     Mr. Pizarro has complied with the requirements of New York General Municipal Law Section 50-i by making and serving a notice of claim on the New York City Comptroller's Office within the time required by New York General Municipal Law Section 50-e. More than thirty days have elapsed since the service of that notice.

        4.     At the request of the City of New York, Mr. Pizarro submitted to a hearing pursuant to New York General Municipal Law Section 50-h.

### JURY DEMAND

5. Pursuant to the Seventh Amendment of the United States Constitution, Mr. Pizarro requests a jury trial on all issues and claims set forth in this Amended Complaint.

## PARTIES

6. Plaintiff Tyler Pizarro (hereinafter "Tyler") is a resident of the State of New York. Tyler is a resident of Queens County, New York.

7. Defendant Joseph Bey (hereinafter "Bey") was employed by the New York City Police Department (hereinafter, "NYDP") and was, at all times relevant herein, was duly appointed and acting police officer of the NYPD with the rank of detective, acting under color of state law, within the scope of his employment, and in his individual capacity pursuant to the statutes, ordinances, regulations, policies, customs and usage of the City of New York.

8. Defendant Steven Lundy (hereinafter "Lundy") was employed by the New York City Police Department and was, at all times relevant herein, was duly appointed and acting police officer of the NYPD with the rank of detective, acting under color of state law, within the scope of his employment, and in his individual capacity pursuant to the statutes, ordinances, regulations, policies, customs and usage of the City of New York.

## FACTS

9. On October 20, 2008, Tyler was a sixteen year-old high school student residing with his mother and brother in Queens County, New York. At approximately 9:19pm, he was walking to meet his friends when he heard gunshots coming from the vicinity of Himrod Street between Cypress Street and Seneca Avenue. He ran from the scene of the shooting to his house.

10. Tyler did not participate in the shooting nor did he witness it.

11. The gunshots Tyler heard resulted in two people being shot, a five year-old girl who was shot in her back as she ran away with her parents when the shots rang out and Francis Dejesus, who was shot in his foot.

12. A police investigation ensued immediately which revealed that there was a shootout involving individuals from rival street gangs, the Patrias and the Bloods.

13. Upon information and belief, several individuals involved in the shooting, who were purportedly members of the gang known as the Patrias, were arrested within 24 hours and several weapons were recovered.

14. Upon information and belief, members of the NYPD had deemed Juan Martinez (hereinafter "Martinez") as a person of interest in connection with the shooting as one of the members of the Bloods. Martinez was/is also known as Iceberg.

15. Upon information and belief, Francis Dejesus, the individual shot in the foot, told investigators that Tyler was NOT a shooter and did NOT possess a gun.

16. On October 21, 2008, Tyler received a phone call from Martinez, who asked Tyler to go to his (Martinez's) apartment to get him clothing. Tyler agreed to go to Martinez's apartment to pick up clothes to bring to him. When he was at Martinez's apartment, Tyler was stopped by members of the NYPD, who, upon information and belief, were conducting surveillance outside of the apartment building for Martinez.

17. Tyler was immediately brought to the 104th Precinct for questioning about the shooting. He answered all questions posed to him. Tyler acknowledged that he was going to bring clothing to Martinez to a location in Brooklyn because the area was "too hot" for him (Martinez) to return to his apartment. Tyler adamantly denied any involvement in the shooting. Tyler's cell phone was taken from him by police officers immediately upon arrival at the precinct. Tyler observed the

officers examining his cell phone. Additionally, on numerous occasions, Tyler requested to call his mother. Each request was denied. After hours of questioning and upon submission of a written statement, Tyler was released. As he was leaving the precinct, a captain of the NYPD said to Tyler words to the effect of "you better not be bullshitting me or else I'll be at your house tomorrow to pick you up."

18. Martinez was apprehended by the NYPD on or about October 22, 2008. Martinez provided the police officers in the 104th precinct with a written statement on October 23, 2008 at approximately 5am. In that statement, Martinez claimed that Tyler was the shooter.

19. Approximately one hour later, three detectives from the NYPD went to Tyler's residence, picked up Tyler and brought him to the 104th Precinct for additional questioning.

20. Tyler was brought to the interrogation room of the 104th Precinct. As he was brought to the interrogation room, he walked by a holding cell. As Tyler was escorted by the holding cell, he was told by Lundy to look into the cell, where Tyler saw Martinez sleeping.

21. Tyler was left inside the interrogation room for about 20 minutes when Lundy entered and told Tyler he lied to the detectives the day before and that the statement that Tyler gave was "complete bullshit". Lundy told Tyler that they had picked up Martinez and that Martinez told them that it was Tyler who shot the little girl. Tyler continued to assert his innocence. As he did so, he was screamed at, threatened and called a liar by Lundy.

22. After approximately 15 minutes, Lundy left the room. Shortly thereafter, Bey entered. Bey essentially reiterated what Lundy had told Tyler, but in a less aggressive and less threatening manner. After approximately 15 minutes, Bey left the room.

23. After Bey left the room, Lundy came in again and continued to berate Tyler by screaming at him, calling him a liar, telling Tyler that his statement was bull, that Iceberg said that

Tyler did it, that Tyler shot a little girl. Tyler continued to maintain his innocence. Lundy told Tyler to write a statement that he was with Iceberg and that he did the shooting or he would never see the light of day again if he didn't have $300,000 to make bail. Lundy told Tyler that he was going to jail with or without the statement, but that it would be better for Tyler if he wrote the statement. Tyler continued to maintain his innocence. Lundy then left the room.

24. Bey then came back into the room and told Tyler to write the statement, that it would be better for him (Tyler). Bey spoke to Tyler in a less aggressive manner than Lundy, but, like Lundy, told Tyler that he was lying about the shooting.

25. Shortly thereafter, a pad and pen was thrown on the table in front of Tyler. At this point, Bey, Lundy and another police officer were in the room with Tyler. Bey and Lundy then told Tyler to write the statement. Tyler continued to maintain his innocence and told them he wasn't there and that because he didn't shoot anyone, he was not going to write a statement. Lundy and the aforementioned officer then left the room, leaving Bey alone with Tyler. Bey continued to persuade Tyler to write the statement. Tyler continued to deny that he shot anyone and that he was not going to write a statement.

26. Lundy then entered the room with a piece of paper. Lundy put the piece of paper on the table and told Tyler that this was Iceberg's statement saying that it was Tyler that shot the little girl. Tyler looked at the statement and saw the portion where Martinez wrote that it was Tyler who shot the little girl.

27. Tyler was scared when he read Martinez's statement. Tyler continued to assert his innocence and questioned why Iceberg would say that Tyler did the shooting. Lundy then left the room with the statement, leaving Tyler and Bey alone.

28. Bey then told Tyler that it would be better for Tyler and that he would get less time if he wrote a statement. Tyler then began to cry as he maintained his innocence. Tyler asked to call his mother, as he had done repeatedly once he was questioned by Lundy the first time, but was told that he couldn't.

29. Tyler then picked up the pen and said to Bey "what do you want me to write?" Bey then dictated, word-for-word, what to write. Tyler complied. After he finished writing the statement, Bey left with the statement. Shortly thereafter, he returned and handcuffed Tyler to a pole attached to the wall. Shortly after that, Lundy and Bey came in with a Miranda sheet and told Tyler to initial the line next to each of the 6 questions and then sign his name at the bottom, which he did. Tyler was never advised of his Miranda rights prior to making his statement.

30. The confession taken by Bey and Lundy was fabricated. There was no other evidence linking Tyler to this crime. Tyler was not a suspect until Martinez implicated him, despite the massive investigation of this crime.

31. The confession of Tyler was the lynchpin of the prosecution's case. Upon information and belief, Bey and Lundy reported to Assistant District Attorney Michael Whitney that the confession that Tyler provided on October 23, 2008 was provided voluntarily by Tyler and that he wrote the confession without any assistance from Bey and/or Lundy.

32. After Tyler did what he was told by Bey and Lundy, Tyler was permitted to call his mother.

33. Tyler was formally arrested at 8am on October 23, 2008. He was arraigned later that evening on charges of Assault in the First Degree, a class B violent felony, Criminal possession of a Weapon in the Second Degree, a class C felony and related charges. Tyler was remanded.

34. Tyler's bail was reduced to $100,000. On or about November 5, 2008, Tyler was released from custody after his family posted bond.

35. At the time of the arrest that is the subject of this action, Tyler had a matter that was adjudicated in Queens County Family Court. He was arrested and charged with Petit Larceny on May 27, 2008, approximately five (5) months prior to the shooting. He was released to the custody of his mother until he was remanded pursuant to a family court order on August 25, 2009, approximately 10 months after the shooting. He wasn't released from custody pursuant to the family court order until March 23, 2010.

36. On August 2, 2010, a pre-trial suppression hearing was conducted concerning the admissibility of Tyler's statement. Bey and Lundy maintained their false version of how Tyler provided his statement, each claiming it was voluntary, free of any duress or coercion. Bey and Lundy were found to be credible and Tyler's coerced statement was deemed to be voluntary and thus admissible at trial.

37. On March 2, 2011, trial commenced in Queens County Supreme Court, Part K11 before the Honorable Joseph Zayas. Tyler faced 25 years in prison.

38. At trial, Bey and Lundy maintained their false version of how Tyler provided his statement, each claiming it was voluntary, free of any duress or coercion. Tyler testified on his own behalf, the only witness presented by the defense.

39. Tyler was found not guilty of all charges.

40. Upon information and belief, Bey and Lundy met with prosecutors before testifying in the Grand Jury, pre-trial hearings and trial and maintained their false version of how Tyler provided the confession that was the lynchpin of the prosecution's case.

41. In providing these false reports and testimony about the confession, Bey and Lundy actively instigated, initiated and perpetuated the prosecution of Tyler.

## FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 Malicious Prosecution
### in Violation of the Fourth and Fourteenth Amendments

42. Defendants Bey and Lundy, acting deliberately and with malice, initiated and took steps to continue the criminal prosecution of Tyler, without probable cause or other legal justification, by fabricating or coercing a confession they falsely attributed to Tyler by refusing to investigate other leads, and in reckless disregard of the truth.

43. Without this confession, there was no probable cause to arrest Tyler. Tyler was not as much as even suspected of having any role in the crimes for which he was charged. No reasonable police officer would have found probable cause to arrest Tyler absent a confession.

44. The prosecution terminated favorably for Tyler when a jury of his peers found him not guilty on all charges.

45. The actions of the defendants resulted in the unlawful detention of Tyler and constituted a conscious-shocking failure to investigate who the true perpetrator of the shootings was.

46. The actions of the defendant police officers violated Tyler's clearly established rights under the Fourth and Fourteenth Amendments, and caused his wrongful detention and the injuries and damages set forth herein.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983 Fabrication of Evidence
### in Violation of the Fourth and Fourteenth Amendments

47. Defendants Bey and Lundy deliberately fabricated evidence by providing the words to Tyler for him to write which inculpated him in a crime which he did not commit, then mis-

represented to prosecutors in oral, pre-trial conversations that were consistent with their subsequent perjurious testimony that the details of the so-called confession were provided voluntarily by Tyler free from duress or coercion.

48. In doing so, they grossly overstated the incriminating value and reliability of the so-called confession provided by Tyler.

49. The so-called confession was used against Tyler at trial and was the lynchpin of the prosecution.

50. This fabrication of evidence violated Tyler's clearly established Fourteenth Amendment rights to a fair trial and not to be deprived of liberty without due process of law.

51. As a direct and proximate result of Bey and Lundy's fabrications, Tyler was incarcerated for a substantial period of time and suffered the injuries and damages described above.

### THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983 Failure to Investigate
### in Violation of the Fourth and Fourteenth Amendments

52. Notwithstanding the fact that no physical or forensic evidence connected Tyler to the shooting and, more importantly, that one of the victims specifically told investigators that Tyler was not one of the shooters, Bey and Lundy refused to acknowledge Tyler's innocence or to investigate evidence provided to them by other eye-witnesses regarding who the true shooter was.

53. This failure to investigate obvious and known exculpatory leads deprived Tyler of his liberty in violation of the Fourth and Fourteenth Amendments.

### FOURTH CAUSE OF ACTION
### 42 U.S.C. § 1983 Suppression of Favorable Evidence
### in Violation of the Fourteenth Amendments

54. Defendants Bey and Lundy knowingly and deliberately chose not to document or disclose to prosecutors information that was favorable and material to Tyler's defense, including

without limitation, the truth about how they elicited the so-called confession as well as that the incriminating statement was dictated word-for-word to Tyler by Bey. The truth about how Bey and Lundy elicited the so-called confession was material evidence that was favorable to Tyler's defense, as it both vitiated the incriminating value of the so-called confession and impeached Bey and Lundy's perjurious version of events.

55. In withholding material exculpatory evidence from prosecutors, Bey and Lundy also deprived Tyler's defense attorney of such evidence in violation of his clearly established Fourteenth Amendment right to a fair trial.

56. Defendants' suppression of this evidence caused Tyler's wrongful incarceration, as well as the injuries and damages set forth herein.

## FIFTH CAUSE OF ACTION
### 42 U.S.C. § 1983 Coercion and Violation of the Right to Counsel in Violation of the Fourth and Fourteenth Amendments

57. Defendants Bey and Lundy isolated sixteen year-old Tyler from his family and refused his repeated pleas to speak to his mother. Despite his protestations of innocence, they engaged in a deliberate course of lies, trickery and deceit in a custodial interrogation that ultimately overbore his will and induced him to write Bey's version of events and falsely incriminated himself in violation of his clearly established Fifth Amendment right to be free from compelled self-incrimination.

58. In depriving Tyler of an attorney, defendants violated his clearly established Sixth Amendment right to counsel.

59. Defendants' coercive and conscience-shocking interrogation tactics generated false and unreliable evidence used against Tyler in the Grand Jury, at a pre-trial suppression hearing and finally at trial, causing his wrongful incarceration and all the injuries set forth herein.
arrested and maliciously prosecuted; to disclose to prosecutors material information favorable to criminal defendants; and to refrain from unconstitutional interrogation techniques and perjury.

**WHEREFORE**, Plaintiff demands the following relief jointly and severally, against all the defendants:

A. Compensatory damages in the amount of FIVE HUNDRED THOUSAND ($500,000.00) DOLLARS.

B. Punitive damages in the amount of ONE MILLION ($1,000,000.00) DOLLARS.

C. Attorneys' fees pursuant to 42 U.S.C. §1988.

D. Such other and further relief as this Court may deem just and proper.

E. Plaintiff demands Trial by Jury.

/KOD/
Kevin P. O'Donnell, Esq. (KO2000)
Attorney for Plaintiff
125-10 Queens Boulevard, Suite 15
Kew Gardens, N.Y. 11415
(718) 261-4500